***********
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Holmes and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award, except for minor modifications. Accordingly, the Full Commission affirms the Opinion and Award of Deputy Commissioner Holmes, with modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered by the parties as:
 STIPULATIONS
The parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act at all relevant times.
An employee-employer relationship existed between plaintiff and Richardson Sports from March 1, 2000, to July 23, 2001, when Richardson Sports released plaintiff.
Defendants have filed a Form 60, admitting to the compensability of plaintiff's claim of injury by accident to his right leg occurring on or about September 17, 2000, while plaintiff was employed with Richardson Sports.
Defendants consent that the injury by accident and plaintiff's claimed degenerative joint disease, arthritis, arthrofibrosis, chondrosis, and/or chondromalacia in his right knee are medical conditions in which there is a substantial risk of the necessity of future medical compensation within the meaning of N.C. Gen. Stat. §§ 97-25.1 and 97-59. Defendants agree to pay for such related medical treatment as it becomes necessary.
During plaintiff's period of employment with Richardson Sports, including the date of the accident and/or last injurious exposure, Cameron M. Harris Co. was the adjusting service and Legion Insurance Company was the carrier on the risk.
Plaintiff's claimed occupational disease(s) and claimed injury by accident of September 17, 2000, were professional football career-ending disease(s) and/or injuries. Plaintiff never played in a professional football game after September 17, 2000.
Under plaintiff's National Football League ("NFL") annual five-year contract dated March 1, 2000, plaintiff was employed with the Carolina Panthers until July 23, 2001. Prior to that period, plaintiff was employed with the Atlanta Falcons from 1992 to January 2000.
Defendants have made payments to plaintiff as detailed in Stipulated Exhibit No. 16, which is incorporated herein by reference.
Plaintiff will be paid $750,000.00 in seventeen equal payments during the 2002 football season. The payments will begin on September 9, 2002.
If the Commission determines that payments are to be awarded under N.C. Gen. Stat. § 97-30, the parties agree that plaintiff's post NFL wage-earning capacity is such that subsequent to the date of injury and up to the date of hearing, it would yield the maximum compensation rate in effect for 2000, i.e., $588.00 per week, subject to credits, if any, to which defendant may be entitled.
11. Exhibits indexed and attached to the Pre-Trial Agreement at Tabs 1 through 18 may be received into evidence without need of further authentication subject to the right of either party to take the testimony of any of the witnesses identified in such records.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff, Charles H. Smith III, was born on December 21, 1969. After high school, he received an associate degree from Northeast Oklahoma Community College in 1990 and attended the University of Tennessee for approximately two years in 1991 and 1992. In the late 1990s, plaintiff attended Regents College in New York, where he received a bachelor's degree.
2. In 1992, plaintiff began his professional football career as a defensive end for the Atlanta Falcons. He played that position for the Falcons until the end of the 1999 season.
3. While playing with the Atlanta Falcons, plaintiff received numerous awards and commendations for his outstanding play, including being named co-captain of the Super Bowl Team and being elected to the All-Pro NFL Team.
4. On or about February 22, 2000, plaintiff was signed to play with the Carolina Panthers. He passed a pre-employment physical performed by a physician of the Panthers' choice and was cleared to play.
5. Like most professional football players, plaintiff had a history of injuries, including one while playing with the Falcons that required knee surgery during the off-season. Those injuries, however, did not significantly affect his ability to play professional football before being injured in September 17, 2000, while playing with the Panthers.
6. On or about September 17, 2000, plaintiff was blocked by a member of the opposing team while engaging in a play with the Panthers during the third game of the regular season. His right leg was put in an unusual position, causing him to sustain a knee injury for which he underwent surgery on or about November 16, 2000, by Donald F. D'Alessandro, M.D., the team physician selected by the Panthers. The nature and severity of the injury were such that despite a long period of rehabilitation, the injury was career ending.
7. Plaintiff never played another football game with the Panthers or any other team after the date of his injury by accident on September 17, 2000, and is incapable of playing football again.
8. Plaintiff's contract with the Panthers, including the yearly periods of renewal, began March 1, 2000, and ran through February 2005.
9. Plaintiff was such a talented and sought-after player that his professional football player contract contained a series of lucrative yearly renewal provisions through the 2004 season. However, as a condition of receiving the next year's contract rate, plaintiff was required to make the active roster. But for this compensable career-ending injury by accident of September 17, 2000, plaintiff would likely have been able to make the active roster for the Panthers throughout his contract period ending February 2005.
10. Had plaintiff not sustained the injury of September 17, 2000, he would have received at least the following amounts in earnings over the balance of his contract period pursuant to the contract that was originally entered into and signed on February 22, 2000, and as modified on March 1, 2001.
YEAR TOTAL PACKAGE AMOUNT
2000 $1,700,000.00
 2001 $2,400,000.00 *
2002 $4,600,000.00
2003 $5,400,000.00
2004 $5,900,000.00
*
 2001 package reduced from $3,400,000.00 at renegotiation of contract dated March 1, 2001
11. If it were not for plaintiff's compensable injury by accident, he would likely have earned a minimum total of $20,000,000 dollars, averaging $4,000,000 dollars per year over the term of his contract running from March 1, 2000, to February 28 or 29, 2005, yielding an average weekly wage of $76,923.08.
12. Given that plaintiff's injury by accident likely cost him over ten million dollars in future earnings under his contract, it would be unfair to plaintiff to not use the post-injury contract earnings as a basis of calculating his average weekly wage.
13. The nature of the NFL players' contract creates exceptional reasons as to why it is not unfair to either plaintiff or defendants to use the future earnings covered by his contract as a basis for calculating plaintiff's average weekly wage. While plaintiff claims an average weekly wage based on what he would have earned but for the injury over the terms of the entire contract including post date of injury, defendants similarly claim they are due a credit for sums paid pursuant to the same contract after the date of plaintiff's compensable injury by accident.
14. The payment of a deferred 3.5 million dollar signing bonus on April 3, 2001, relates back as an amount plaintiff earned, though later paid, for signing with the Panthers in February of 2000.
15. Post injury payments in the sum of $4,805.72 were made to plaintiff during the period of April 2, 2001, to May 21, 2001, for plaintiff's participation in the Workout, MiniCamp, and Training Camps, as well as an Appearance Fee pursuant to his contract. These payments constitute post-injury earnings.
16. The $800,000.00 paid by defendants to plaintiff in installments ($47,059.00 per week) both before and after the date of injury from September 5, 2000, to December 28, 2000, under the terms of Paragraph 9 of the standard NFL players contract, were in part pre-injury earned income (3 payments for 3 games) and post-injury payments made pursuant to an employer totally funded disability plan (the last 14 weekly payments from September 25, 2000, to December 28, 2000). The payment made on September 18, 2000, represented earnings for playing in the September 17, 2000, game in which plaintiff was injured, and was not paid as a disability payment.
17. Payments in the sum of $225,000.00 pursuant to the injury protection plan running from September 20, 2001, to approximately December 31, 2001 (made in installments of $13,235.30) represent payments made from revenue designated as employee revenue under the division of revenue between management and the players' union pursuant to the collective bargaining agreement. The source of the injury protection plan monies were paid in toto by all NFL player-employees, including plaintiff, and is for a type of disability plan. The revenues that funded this plan, which was the source of the payments made to plaintiff, were not paid by the employer.
18. Plaintiff's post injury wage earning capacity outside of the NFL is $40,000.00 per year during the relevant 300-week time period covered by N.C. Gen. Stat. § 97-30.
19. The roster signing bonus of $1,000,000.00 paid April 3, 2001, to plaintiff was the result of a unilateral decision on the part of the Panthers to place plaintiff on the 2001 roster, most likely to keep him from being picked up by another team if he had been able to recover from his injury and play again. This payment is deemed as earnings to plaintiff. Even if the one million dollar roster payment were deemed as earnings, when combined with his post NFL wage earning capacity (represented by his $40,000.00 yearly salary as a radio announcer), it would still far exceed the maximum compensation rate of $588.00 per week applicable for the year 2000 when subtracted from Plaintiff's average weekly wage and multiplied by two-thirds under N.C. Gen. Stat. § 97-30.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. Plaintiff sustained a compensable injury by accident and developed compensable occupational disease(s) as a result of an admittedly compensable event arising out of and in the course of his employment with defendants on September 17, 2000. N.C. Gen. Stat. § 97-52.
2. Plaintiff is entitled to partial disability compensation for 300 weeks dating from September 17, 2000, the date of his initial injury by accident at the maximum rate of $588.00 per week in effect during the year 2000. N.C. Gen. Stat. § 97-30.
3. Plaintiff is entitled to lifetime compensation for past and future medical coverage for any injuries, conditions, and diseases resulting from his compensable injury by accident and occupational disease(s) to his knee. N.C. Gen. Stat. §§ 97-25; 97-25.1; and 97-59.
4. Defendant is entitled to a credit for 14 weeks of compensation payments at the weekly rate of $588.00, to be deducted from the end of the 300-week period under N.C. Gen. Stat. §§ 97-30 and 97-42.
5. Exceptional reasons exist for using the method used herein for calculating plaintiff's average weekly wage that most accurately approximates the amount which plaintiff would be earning were it not for the injury or disease(s) he sustained. N.C. Gen. Stat. § 97-2(5).
To ignore the uncontroverted circumstantial evidence on the issue of whether plaintiff would have made the team and, thereby, qualify for the applicable salary and roster bonus for each respective year of his contract would disregard the appellate standard applicable to workers' compensation cases: "The evidence tending to support plaintiff's claim is to be viewed in the light most favorable to plaintiff, and plaintiff is entitled to the benefit of every reasonable inference to be drawn from the evidence." Adams v. AVX Corp., 349 N.C. 676, 681, 509 S.E.2d 411, 414
(1998).
The Deputy Commissioner correctly concluded that plaintiff's average weekly wage should be determined by adding up the entire amount he would have earned if his injury of September 17, 2000 had not ended his career. This is the approach previously applied by the Commission for professional football players, which was affirmed on appeal. Larramore v.Richardson Sports Ltd., 141 N.C. App. 250, 540 S.E.2d 768 (2000), aff'dper curiam, 353 N.C. 520, 546 S.E.2d 87 (2001).
Based on the appellate decision in Larramore, there are two allowable methods for calculating the average weekly wage for a professional football player, such as plaintiff, that would "most nearly approximate the amount which the injured employee would be earning were it not for the injury." N.C. Gen. Stat. § 97-2(5). The first method would be to average the amounts earned by plaintiff under the first year provisions of his contract. Therefore, the calculation under N.C. Gen. Stat. §97-30 would be: 2/3 x ($102,097.74 — $20,000.00), for a total of $54,759.92 per week, which exceeds the maximum weekly compensation rate of $588.
The second method would be to average the amounts plaintiff would have earned from the date the contract was signed, February 20, 2000, over the entirety of its term from March 1, 2000 through February 28 or 29, 2005. The calculation under N.C. Gen. Stat. § 97-30 for this method is: 2/3 ($76,923.08 — $20,000.00) for a total of $37,967.69 per week. Thus, either method of calculating the average weekly wage allowable under Larramore yields the maximum compensation rate of $588 per week.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
Defendants shall pay directly to plaintiff compensation at the rate of $588.00 per week pursuant to the terms of N.C. Gen. Stat. § 97-30, beginning on September 17, 2000, for a period of 286 weeks, subject to the attorney's fee awarded below. Any amount that has accrued shall be paid to plaintiff in one lump sum and the balance shall be paid over the remainder of the 286-week period.
Defendants shall pay 25% of the accrued amount due plaintiff in Paragraph 1 of this award directly to plaintiff's counsel. Thereafter, defendants shall send every fourth compensation check to plaintiff's attorney.
Defendants shall pay to plaintiff all medical and related expenses resulting from his compensable injury by accident and compensable occupational disease(s) for so long as such treatment affects a cure, gives relief or tends to lessen plaintiff's period of disability.
Defendants shall pay the costs, including fees for copies of any transcript or depositions.
This 8th day of May 2003.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER